IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MATTHEW TRENKA, | ) | CASE NO. 1:16-cv-00303 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Matthew Trenka ("Plaintiff" or "Trenka") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Court find no error with respect to the ALJ's weighing of the medical opinions rendered by Trenka's treating mental health providers - Dr. Augis and Dr. Campbell.  However, the undersigned recommends that the Court **REVERSE and REMAND** the Commissioner's decision for further evaluation and explanation of the medical evidence regarding Trenka's vision impairments and the functional limitations included in the RFC to account for Trenka's vision impairments.  Also, it is

1

recommended that on remand the ALJ be required to more fully explain how the RFC limitations

adequately account for Trenka's fatigue, depression and headaches.

## I.  Procedural History

Trenka protectively filed an application for DIB on June 5, 2012.[1]  Tr. 26, 196-202, 222.

Trenka alleged a disability onset date of April 26, 2012, (Tr. 26, 196, 222), and he alleged

disability due to a brain aneurysm, seizures, and poor vision in his right eye (Tr. 105, 121, 137,

147, 226).  After initial denial by the state agency (Tr. 137-140) and denial upon reconsideration

(Tr. 147-153), Trenka requested a hearing (Tr. 154-155).  A hearing was held before

Administrative Law Judge Susan G. Giuffre ("ALJ") on March 19, 2014.  Tr. 47-102.

In her June 13, 2014, decision (Tr. 23-46), the ALJ determined that Trenka had not been

under a disability from April 26, 2012, through the date of the decision (Tr. 26, 41).  Trenka

requested review of the ALJ's decision by the Appeals Council.  Tr. 22.  On December 14, 2015,

the Appeals Council denied Trenka's request for review, making the ALJ's decision the final

decision of the Commissioner.  Tr. 1-6.

## II. Evidence

### A.      Personal, educational, and vocational evidence

Trenka was born in 1973.  Tr. 40, 196, 222.  Trenka completed high school.  Tr. 51, 227.

Trenka lives with his girlfriend.  Tr. 56.  They have been together for close to 20 years.  Tr. 62.

Trenka's past work included various jobs at a cleaning company.  Tr. 52-53.  Initially, he

was a cleaner.  Tr.  52.  Then he became a supervisor, a staff manager, and the general manager.

Tr. 52-53.  When Trenka was working as staff manager, he supervised about 15 individuals.  Tr.

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 12/8/2016).

53.  His duties included setting schedules for the individuals he supervised.  Tr. 53.  As the general manager, he had the authority to hire and fire individuals.  Tr. 53.  After working at the cleaning company, Trenka started working for a masonry restoration company.  Tr. 54.  Trenka's work at the masonry restoration company was very labor intensive, including heavy lifting, climbing up and down scaffolding, and using electrical tools. Tr. 55.   His last job was at the restoration company.  Tr. 56.

## B.    Medical evidence

### 1.    Treatment records

On April 26, 2012, Trenka's girlfriend found Trenka having a seizure.  Tr. 81, 315, 350, 363.   Trenka had no history of seizures.  Tr. 315, 352, 363.  He was taken to Hillcrest Hospital via ambulance and arrived at the hospital unresponsive.  Tr. 315.   Trenka was diagnosed with an acute sub-arachnoid brain hemorrhage.  Tr. 304-319.   Trenka was discharged from the emergency room and transferred to Cleveland Clinic's main campus.  Tr. 319.   While hospitalized, coil embolization of right A1/A2 aneurysm was performed.[2]  Tr. 326.  Trenka remained hospitalized until May 10, 2012, when he was discharged to a skilled nursing facility – Grande Pointe Health Care Community ("Grande Point").  Tr. 362-363, 533-547.  Trenka was at Grande Pointe until May 25, 2012.  Tr. 540.  Trenka's Grande Point Occupational Therapy Discharge Summary reflects that Trenka was making progress with his goals and was discharged because he "met [his] highest potential."  Tr. 540.

On June 25, 2012, Trenka saw Mary E. Aronow, M.D., of the Cleveland Clinic with complaints of blurry vision and foreign body sensation.  Tr. 588-591.  Trenka reported blurry

---

[2] "[E]ndovascular coiling, also called endovascular embolization, [is used] to block blood flow into an aneurysm. An aneurysm is a weakened area in the wall of an artery. . . Preventing blood flow into an aneurysm helps to keep it from rupturing."
http://www.hopkinsmedicine.org/healthlibrary/test_procedures/neurological/endovascular_coiling_92,p08768/ (last visited 12/8/2016).

vision since his coil embolization surgery.  Tr. 590.  Dr. Aronow noted reports of anxiety/depression, muscle aches, headaches, imbalance, seizures, sinusitis, and fatigue.  Tr. 588. Dr. Aronow diagnosed Terson's syndrome[3] (macula affected OD) and recommended that fundus photos be obtained and that Trenka follow up with retina clinic in one week.  Tr. 590-591.

On July 10, 2012, at the request of Dr. Aronow, Trenka saw Dr. Rishi Singh, M.D., an ophthalmologist, for a consult regarding his right eye.  Tr. 598-601.  Dr. Singh noted that Trenka reported that following symptoms – intermittent waves in his vision, which was described as a ghost-like vision; intermittent eye redness; foreign body sensation; photophobia; and tearing.  Tr. 598.  Trenka did not report floaters.  Tr. 598.  Dr. Singh recorded Trenka's visual acuity on the right as 20/125 and his visual acuity on the left as 20/20.  Tr. 600.  Dr. Singh confirmed the diagnosis of Terson's syndrome (macula affected OD).  Tr. 601.   In August 2012, Trenka saw Dr. Singh for follow-up.  Tr. 607-611, 612-615.  Trenka reported blurred vision; eye redness; feeling a foreign object sensation; feeling like being poked in the eye; and tearing. Tr. 607. Trenka reported that he always had a headache.  Tr. 607.  Dr. Singh recorded Trenka's visual acuity on the right as 20/70 and on the left as 20/20.  Tr. 609.  Dr. Singh recommended that Trenka return for follow up in 12 weeks.  Tr. 610.

On August 8, 2012, Trenka saw Thomas J. Masaryk, M.D., and Susan Cancian, RN, for a neurological evaluation following his subarachnoid hemorrhage.  Tr. 602-608.  Trenka reported feeling better since his discharge but indicated that his symptoms included "low grade" headaches, short term memory difficulty, and significant fatigue.  Tr. 602.  Dr. Masaryk recommended follow-up in one year post hemorrhage and also recommended an evaluation for depression.  Tr. 603.

---

[3] Terson's syndrome is "vitreous hemorrhage caused by spreading of an intracranial, subarachnoid, or subdural hemorrhage."  *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 1850.

On November 19, 2012, Trenka saw Dr. Singh for follow up.  Tr. 771-775.  Trenka reported rare instances of flashes, floaters, and occasional discomfort and redness.  Tr. 771.  He did not report eye pain.  Tr. 771.  Dr. Singh recorded Trenka's visual acuity as 20/300 on the right and 20/20 on the left.  Tr. 773.

Trenka had physical therapy in November and December of 2012 for his upper and lower back.  Tr. 636-640.  Trenka was tolerating the treatment but was continuing to report pain, with reported pain levels ranging from a 4/10 to an 8/10.  Tr. 636-640.  Tr. 363-640.

In January 2013, Trenka saw Dr. Riad Laham, M.D., and Mary Schultz, RN, in the pain department at Hillcrest.  Tr. 645-651.  Trenka reported headaches and neck and back pain that started 7-8 months following his aneurysm.  Tr. 649.  Trenka had been using Percocet daily with little improvement.  Tr. 649.  Trenka was using Celexa for depression.  Tr. 649. On examination, it was observed that Trenka had generalized tenderness without any major muscle spasm or focal tender points; his extremities exam was negative; and his neuro exam was grossly intact without any major motor or sensory deficit.  Tr. 649.  Dr. Laham assessed neuropathic pain.  Tr. 649.  Recommendations included starting Neurontin, continuing Percocet as needed, and following up in 4 weeks.  Tr. 649.

Trenka started seeing Rimvydas Augis, Ph.D., Psy.D., for counseling/psychotherapy in January 2013 (Tr. 759-760) and continued therapy with Dr. Augis through 2014 (Tr. 671-760).  Trenka reported to Dr. Augis that he had been depressed prior to the aneurysm.  Tr. 759.  His parents had both died of cancer and it took Trenka years after his parents' deaths to feel like himself.  Tr. 759.  Trenka indicated he had no ambition and did not care.  Tr. 759.  He could not continue to work because his eye was damaged and he was in constant pain.  Tr. 759-760.

On January 31, 2013, Trenka saw Sylvester Smarty, M.D., for an initial psychiatric evaluation.  Tr. 664-669.  Trenka's girlfriend was present for the evaluation.  Tr. 664.  Trenka relayed that, ever since the aneurysm, things had been a mess.  Tr. 664.  He indicated that he had been having anxiety and depression symptoms for "two decades" and that his depression had worsened since the aneurysm.  Tr. 664.  Trenka indicated that he had suicidal thoughts and wished he would have died from the aneurysm.  Tr. 664.  He admitted having a violent temper and not liking people.  Tr. 664.  Dr. Smarty diagnosed episodic mood disorder, NOS, and assessed a GAF score of 45-50.[4]  Tr. 667.  Dr. Smarty prescribed Depakote ER for emotional lability and Klonopin for anxiety, emotional lability and sleep.  Tr. 668.

On February 8, 2013, Trenka was seen at Hillcrest Hospital's emergency room for shoulder pain.  Tr. 825-834.  Trenka reported that his pain had been ongoing and he recently aggravated it two days prior to his visit when he was helping a friend load a motorcycle into a truck and he slipped and pulled on his arm in an effort to avoid falling.  Tr. 826.  Trenka's pain was constant.  Tr. 827.  He described his pain level as an 8/10 but his pain did not radiate and he did not have numbness or tingling.  Tr. 827.  Trenka had seen someone in the pain management department and was prescribed Neurontin that day.  Tr. 826.  Trenka was unhappy with the treatment by pain management and went to the emergency room for a second opinion.  Tr. 826-827.  On examination, Trenka exhibited a good range of motion in his shoulders, neck and back; his gait was within normal limits; and there was no noted deformity or swelling.  Tr. 828.  A

---

[4] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)."  *Id.* With the publication of the DSM-5 in 2013, the GAF was not included in the DSM-5.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fifth Edition, Arlington, VA, American Psychiatric Association, 2013  ("DSM-5"), at 16.

shoulder x-ray showed no acute soft tissue or bony abnormality.  Tr. 831.  The emergency room provider diagnosed shoulder pain/muscle strain.  Tr. 828, 832.  Since Trenka had already been seen by pain management that day for the same pain, no prescription was provided to Trenka.  Tr. 829.  Trenka was stable at discharge.  Tr. 829.

Trenka saw Dr. Singh again on February 11, 2013, for follow up.  Tr. 776-780.  Trenka's symptoms included redness and irritation in the right eye, as if someone had poked him in the eye, and flashes.  Tr. 776.  Trenka did not report floaters.  Tr. 776.  Trenka did report intermittent eye pain ranging from a 2 at the low end to a 9 at the high end, with zero being the lowest and 10 being the highest.  Tr. 776.  Dr. Singh recorded Trenka's visual acuity as 20/600 in the right eye and 20/20 in the left eye.  Tr. 778.  Dr. Singh continued to diagnose Terson's syndrome (macula affected OD).  Tr. 779.  Dr. Singh noted that Trenka appeared improved but overall Trenka's vision was poor which Dr. Singh indicated was "from likely optic nerve dysfunction or retinal atrophy."  Tr. 779.  Dr. Singh also indicated that Trenka was continuing to have headaches.  Tr. 779.

On February 28, 2013, Trenka saw Dr. Smarty again.  Tr. 662-663.  Trenka reported that he was feeling depressed because his medical condition was not improving.  Tr. 662.  He had been short tempered and irritable and was not sleeping well.  Tr. 662.  Dr. Smarty started Trenka on Zoloft for his depressive symptoms and recommended that he begin supportive therapy.  Tr. 663.  On March 28, 2013, during a follow-up visit with Dr. Smarty, Trenka reported that he was doing a little better.  Tr. 660.  He was not as irritable as he had been.  Tr. 660.  Trenka thought his irritability might have been because of the Neurontin.  Tr. 660.  He was sleeping better but was still feeling fatigued and having anxiety symptoms.  Tr. 660.  Trenka denied suicidal

thoughts.  Tr. 660.  Dr. Smarty increased Trenka's Zoloft dosage to help him with his depressive and anxiety symptoms and continued other medication.  Tr. 661.

In April 2013, Trenka saw Dr. Augis and reported that he started working on painting three football player figures.  Tr. 741.  After working on them for a period of time his eyes started to hurt.  Tr. 741.  On May 16, 2013, Trenka reported to Dr. Augis that he had noticed improvement in the length of time he could play the drums.  Tr. 729.  Also, he had been able to work in the yard for about 2-3 hours but afterward he was tired for 2 days. Tr. 729.  Also, in May 2013, Trenka relayed to Dr. Augis that he was easily tired and exhausted but he also indicated that his primary care physician was encouraging him to do more things.  Tr. 727.

In May 2013, Trenka transferred from Dr. Smarty to Elaine Campbell, M.D., for his mental health care.  Tr. 658-659.  Trenka reported low energy, constant pain, and irritability from the pain. Tr. 658.  He indicated that he isolates himself and had poor sleep but a good appetite. Tr. 658.  Dr. Campbell noted that Trenka's mood/affect was depressed.  Tr. 658.  Dr. Campbell adjusted Trenka's medications.  Tr. 659.  Trenka continued to see Dr. Campbell in 2013.  Tr. 652-657.

On May 21, 2013, Trenka saw Nurse Schultz with complaints of a headache and upper and lower back pain.  Tr. 840-842.  Trenka was rating his pain about a 5 out of 10, with the pain mostly between his shoulder blades.  Tr. 842.  Trenka reported relief from use of a TENS unit, application of heat and medication.  Tr. 840.  Trenka reported that his activities of daily living had improved and he reported no difficulty performing or completing daily living activities.  Tr. 840.  Nurse Schultz's impression was neuropathic and myofascial pain and she increased his prescription for Elavil.  Tr. 842.

During a June 2013 visit with Dr. Augis, Trenka indicated that his band had not practiced for a month or so.  Tr. 723.  Trenka was trying to increase his stamina for playing the drums.  Tr. 723-724.  Also, in June 2013, Trenka reported feeling good about finishing figurines he had been working.  Tr. 721.  He indicated though that, since his aneurysm, it took him much longer to do the work and he did not want to take many orders from customers because he was still not in great shape and did not have a lot of motivation to do the work.  Tr. 721-722.

In August 2013, Trenka saw Dr. Singh again.  Tr. 781-785.  Trenka reported blurred vision, difficulty reading (headaches after 15 minutes of reading); difficulty watching television (seeing the words on the television); floaters (white squiggly lines); and photophobia.  Tr. 781. Trenka was continuing to have headaches.  Tr. 784.  Trenka informed Dr. Singh that two spinal taps had been performed with normal intracranial pressure.  Tr. 784.  Dr. Singh recorded Trenka's visual acuity as 20/1000 in the right eye and 20/20 in the left eye.  Tr. 783.  Dr. Singh continued to assess Terson's syndrome (macula affected OD) but noted that Trenka appeared stable.  Tr. 784.  Dr. Singh noted that Trenka's poor vision was likely due to optic nerve dysfunction or retinal atrophy.  Tr. 784.

In October 2013, Trenka saw Dr. Laham and Lindsay Kennedy, PCNA, with complaints of headaches and neck and back pain.  Tr. 842-845.  Dr. Laham's impression was neuropathic and myofascial pain and medication was prescribed.  Tr. 845.

During 2013 and 2014, Trenka also saw and was treated by his primary care physician Miodrag Zivic, M.D., with various complaints, including upper back pain, high blood pressure, fatigue, ringing in his ears, headaches and dizziness.  Tr. 792-814.

Trenka was continuing to see Dr. Augis as well.  Tr. 671-760.  At times, Trenka reported being able to be around others but other times Trenka was continuing to isolate.  For example, in

early December 2013, Trenka relayed to Dr. Augis that he had gone to his aunt's home for Thanksgiving and it was "OK" whereas in the past it had been too much for him.  Tr. 687.  In contrast, later in December 2013, Trenka reported that his girlfriend had been out of town and he was alone and felt anxious and did not leave the house.  Tr. 683.  In January 2014, Trenka reported that he had decided that two of his friends had let him down and he felt that maintaining the friendships was not worth it.  Tr. 675.  He did not want to attend a friend's wedding because he did not want to get into fake conversations and was not good at mingling.  Tr. 675.

On May 12, 2014, Trenka saw Deborah E. Tepper, M.D., of the Cleveland Clinic Headache Center for an opinion regarding his headaches.  Tr. 863-876.  Dr. Tepper felt that Trenka's ongoing use of narcotics to treat his headaches was feeding into a chronic pain syndrome with his back and neck.  Tr. 868.  She recommended that he avoid the use of pain medication more than 2 days per week and avoid narcotics all together.  Tr. 868.  She also recommended that Trenka increase his level of activity to a half hour per day and participate in some type of organized activity.  Tr. 868.  Trenka was isolating himself, often in the basement with dim lighting, which would only serve to impact Trenka's sensitivity to light and other stimulation.  Tr. 868.  Dr. Tepper's diagnoses included chronic migraine, headache attributed to subarachnoid hemorrhage, and headache attributed to intracranial endovascular procedures.  Tr. 868.

### 2.    Opinion evidence

#### a.    Treating source opinions

##### *Dr. Augis*

On February 10, 2014, Dr. Augis completed an Assessment of Ability to Sustain Work-Related Activities (Mental).  Tr. 761-765.  Dr. Augis indicated that Trenka had been diagnosed

with adjustment disorder with anxiety and depression.  Tr. 765.  He opined that Trenka had less than a 40% ability to perform the following work-related tasks: complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; maintain attention and concentration for extended periods (approximately 2-hour segments between arrival and first break, lunch, second break, and departure); interact appropriately with the general public and accept instructions and respond to criticism from supervisors; respond appropriately to changes in a work setting; and deal with ordinary work stress.  Tr. 761-764.  Dr. Augis opined that Trenka had the ability to get along with coworkers or peers and maintain socially appropriate behavior approximately 45% of the time.  Tr. 762.  Dr. Augis opined that Trenka had the ability to sustain an ordinary routine without special supervision and work in coordination with or in proximity to others without being unduly distracted by them between 60-80% of the time.  Tr. 761.  Dr. Augis also opined that Trenka had the ability to understand and remember very short and simple instructions and carry out short and simple instructions approximately 85% of the time. Tr. 761.  Dr. Augis opined that Trenka would likely be absent from work more than four times per month as a result of his impairments or treatment.  Tr. 764.

Dr. Augis explained in narrative form that Trenka would be unable to sustain certain activities for an 8-hour work shift because his anxiety and depression would prevent him from sustaining attention and concentration.  Tr. 762.  Dr. Augis stated that, before his aneurysm, Trenka was able to compensate for unresolved conflicts with his father but now his functioning was impacted.  Tr. 763.  Dr. Augis indicated that Trenka's ability to function in any setting, including work, was very limited.  Tr. 764.  Based on his 47 individual counseling sessions with Trenka, Dr. Augis stated that the aneurysm had significantly impaired Trenka's adaptation;

increased his anger and inappropriate outbursts, self-destructive thoughts and suicidal ideation, confusion, social isolation, and decreased his frustration tolerance.  Tr. 765.

### *Dr. Campbell*

On February 27, 2014, Dr. Campbell completed an Assessment of Ability to Sustain Work-Related Activities (Mental).  Tr. 820-822.  Dr. Campbell opined that Trenka was very limited in all work-related areas.  Tr. 820-822.  Dr. Campbell opined that Trenka could carry out short and simple instructions about 25% of the time.  Tr. 820.  In all other areas rated, Dr. Campbell opined that Trenka could perform the work-related tasks 20% or less of the time.  Tr. 820-822.  Dr. Campbell opined that Trenka would likely be absent from work more than four times per month due to his impairments or treatment.  Tr. 822.

Dr. Campbell indicated that Trenka had initially been diagnosed with adjustment disorder.  Tr. 821.  However, due to Trenka's poor response to treatment, Dr. Campbell suspected a diagnosis of bipolar disorder.  Tr. 821.  Dr. Campbell indicated that the aneurysm caused headaches, memory loss and poor focus which lead to decreased comprehension.  Tr. 821.  Dr. Campbell also indicated that Trenka had severe mood swings with irritability being prominent.  Tr. 822.  Also, Dr. Campbell noted that Trenka's medication causes increased sedation.  Tr. 822.

### *Dr. Singh*

On February 11, 2014, Dr. Singh completed a statement regarding Trenka's visual acuity and associated limitations.  Tr. 786-791.  Dr. Singh indicated that Trenka had Terson's syndrome OD (right eye).[5]  Tr. 789.  Dr. Singh indicated that Trenka's best-corrected visual acuity as of August 12, 2013, was 20/20 in the left eye and 20/1000 in the right eye.  Tr. 789.

---

[5] According to the statement completed by Dr. Singh, "OD" stands for right eye and "OS" stands for left eye.  Tr. 787.

Dr. Singh opined that, due to his visual loss, Trenka could not safely drive large commercial vehicles or machinery without excessive risk to others.  Tr. 789.   Dr. Singh indicated that Trenka should have an occupational health therapy evaluation "to determine A + C."[6]  Tr. 789.

### Dr. Zivic

On February 24, 2014, Dr. Zivic completed a "General Medical Source Statement: Detailed with Hands about what the claimant can still do despite impairment(s)."  Tr. 815-819. Dr. Zivic indicated that he saw Trenka every 2-3 months for 18 months, with a diagnosis of aneurysmal subarachnoid hemorrhage.  Tr. 815.  Dr. Zivic indicated that Trenka's prognosis was "good."  Tr. 815.  Dr. Zivic noted the following clinical findings: headache, blurred vision, fatigue, and depression.  Tr. 815.  Trenka's symptoms included: multiple tender points; excessive fatigue; stiffness; frequent, severe headaches; neck pain; chronic pain; numbness and/or tingling; dizziness; depression; and back pain.  Tr. 815.  Dr. Trenka did not believe that Trenka was a malingerer.  Tr. 815.  Dr. Zivic opined that emotional factors contributed to Trenka's symptoms and functional limitations.  Tr. 815.  Dr. Zivic noted that Trenka's pain was located bilaterally in his thoracic spine, shoulders, and legs.  Tr. 816.  The following factors made Trenka's pain worse – changing weather, fatigue, activity and repetitive motion.  Tr. 816.   Medication side-effects included dizziness, drowsiness, and tiredness.  Tr. 816.

Dr. Zivic opined that, in an eight-hour workday, Trenka could stand or walk continuously at one time for 30 minutes; stand/walk for a total of 1 hour or less; sit at one time before requiring a rest or an alternate posture for 1 hour; and sit for a total of 3 hours.  Tr. 817.  Dr. Zivic opined that Trenka would require a job that would allow for shifting positions at will from

---

[6] Two questions – questions A and C - regarding safety at work were not answered by Dr. Singh.  Tr. 789. Question "A" asked "Is the person able to safely work at unprotected heights (e.g., working on a roof, climbing a telephone pole) without excessive risk to self or others?"  Tr. 789.  Question "C" asked "Is the person able to reasonably avoid workplace hazards?"  Tr. 789.  Thus, Dr. Singh may have been referring to these two questions when he said "patient should have an occupational health therapy evaluation to determine A + C."  Tr. 789.

sitting, standing or walking and Trenka would need to take unscheduled 15-minute breaks frequently during the workday to sit quietly or stretch.  Tr. 817.   Dr. Zivic indicated that Trenka would not require use of a cane or other assistive device and would not need to elevate his legs with prolonged sitting.  Tr. 817.  Dr. Zivic was asked to offer his opinion regarding Trenka's ability to perform other activities, with the following rating choices – "never/rarely," with "rarely" defined as 1%-5% of an 8-hour workday; "occasionally" defined as 6%-33% of an 8-hour workday; "frequently" defined as 34%-66% of the workday; and "constantly."  Tr. 818.  Using the foregoing ratings, Dr. Zivic opined that Trenka could lift and carry less than 10 pounds frequently; 10-20 pounds occasionally; and 50 pounds never/rarely.  Tr. 818.  Dr. Zivic also opined that Trenka could never/rarely kneel, stoop, and crouch/squat and he could occasionally bend, climb stairs, balance, look down (sustained flexion of neck), turn head right, look up, and turn head left.  Tr. 818.  Dr. Zivic indicated that Trenka had no significant limitations with regard to reaching, handling, or fingering.  Tr. 818.  Dr. Zivic indicated that Trenka's impairments would likely cause "good days" and "bad days" and Trenka would likely be absent from work more than 4 days per month.  Tr. 819.  Dr. Zivic indicated that Trenka's condition had existed and persisted with the limitations noted since April 2012.  Tr. 819.

### b.    Consultative examiner opinions

_Dr. Koricke_

On August 20, 2012, Clinical Psychologist Deborah A. Koricke, Ph.D., completed a psychological evaluation.  Tr. 617-625.  Trenka indicated to Dr. Koricke that the reason for his disability was the brain aneurysm he had which caused him vision impairment, fatigue, confusion, concentration deficits, inability to drive, anxiety, depression and paranoia.  Tr. 617.  Trenka relayed that he was an only child and his parents both died of cancer four months apart

from each other.  Tr. 617.   Per Trenka, he was depressed after his parents' deaths; his depression had resolved but reappeared following his aneurysm.  Tr. 618, 621.  Trenka indicated that he last worked as a brick layer foreman in December 2011 and was laid off.  Tr. 618.

Dr. Koricke opined that Trenka demonstrated a depressed mood with a major depressive disorder falling in the moderate range.  Tr. 621.  Trenka tested within the average range of intellectual ability.  Tr. 621.  Dr. Koricke noted Trenka became frustrated and depressed as the testing went on and his performance on the final test performed (the WMS-IV) was viewed as invalid.  Tr. 621.  Dr. Koricke opined that, "[w]hile Mr. Trenka did complain of slower information processing, this appears to be a function of his vegetative depressive disorder which makes him appear slowed down and lethargic.  I did not note any significant cognitive deterioration which would indicate a diagnosable cognitive disorder secondary to the aneurysm." Tr. 621.  Dr. Koricke further opined that, "[f]rom a psychological standpoint, Mr. Trenka is viewed as struggling from significant depressive symptoms which cause moderate impairment in his ability to function on a daily basis."  Tr. 622.  Dr. Koricke assigned a GAF score of 55.[7]  Tr. 622.

Dr. Koricke rated Trenka's work-related abilities.  Tr. 622-623.   In the area of understanding, remembering and carrying out instructions, Dr. Koricke concluded that Trenka had no significant difficulty understanding questions or instructions, including complex or multi-step, and had adequate memory for his history.  Tr. 622.  Dr. Koricke indicated though that Trenka's ability to remember instructions might be negatively impacted by his lapses in attention and might make it difficult for him to fully remember what he had been told.  Tr. 622.  Also, she

---

[7] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *See* DSM-IV-TR, at 34

indicated that it was likely that Trenka would have a difficult time recalling what needed to be done in the work place in order to follow through with completing tasks.  Tr. 622.

With respect to Trenka's abilities and limitations in maintaining attention and concentration, persistence and pace to perform tasks, including multi-step tasks, Dr. Koricke stated that Trenka's attention/concentration levels varied throughout the interview and he struggled at times to remain focused.  Tr. 622.

With respect to Trenka's abilities and limitations in responding appropriately to supervision and coworkers in a work setting, Dr. Koricke concluded that Trenka would have limitations in his ability to respond to others in the work place because of his emotional issues. Tr. 622-623.

In regard to Trenka's abilities and limitations in responding appropriately to work pressures in a work setting, Dr. Koricke opined that exposure to work pressures might increase Trenka's depression symptoms and indicated that Trenka did not have effective coping skills to manage his emotional outbursts.  Tr. 623.

### *Dr. Sioson*

On September 6, 2012, Eulogio Sioson, M.D., CIME, saw Trenka for a one-time disability evaluation.  Tr. 626-631.  Trenka reported that his medical problems included a brain aneurysm, hypertension, neck/back/joint pains and depression.  Tr. 626.  Trenka indicated that he had not worked since December 2011 because of his medical problems.  Tr. 626.

On examination, Dr. Sioson's observations included Trenka walking with no assistive device; Trenka losing his balance trying to tandem walk; rising from a 1/4 squat with back pain and depth perception problems but being able to get up and down from the examination table. Tr. 627.   Trenka's visual acuity was 20/20 on the left with no correction and, with his right eye,

16

Trenka "could see crumpled image centrally but he said he could see clearly peripherally."  Tr. 627.  Trenka had tenderness in his left shoulder and minimal neck and back tenderness.  Tr. 672.  Trenka had no sensory deficit and no muscle atrophy.  Tr. 627.  Manual muscle testing was normal.  Tr. 627.

Dr. Sioson's impressions were: (1) hypertension/brain aneurysm, with a coil placement and no apparent significant motor or sensory deficit or overt congestive heart failure and there was no recurrence of seizure; (2) neck/back/joint pains with no apparent radiculopathy, gross deformity or inflammatory changes in the joints; (3) depression but Trenka was not emotionally labile and was able to maintain attention and concentration; and (4) obesity.  Tr. 627.  In summary, Dr. Sioson concluded that, considering limitation of range of motion from pain and the findings noted in the report, "work-related activities would be limited to light work."  Tr. 627.

### c.     State agency reviewing opinions

#### *Drs. Zwissler and Goldsmith*

On September 11, 2012, state agency reviewing psychologist Mel Zwissler, Ph.D., reviewed the file and completed a Psychiatric Review Technique and Mental RFC Assessment.  Tr. 110-111, 115-117.  Dr. Zwissler opined that Trenka had moderate limitations in activities of daily living, maintaining social functioning and maintaining concentration, persistence or pace and there were no episodes of decompensation of extended duration.  Tr. 110-111.  In the Mental RFC Assessment, Dr. Zwissler opined that Trenka would be limited to 1-2 step tasks in a routine work environment, would be limited to superficial interaction with others, and would be limited to a static work environment where any changes in routine could be readily explained.  Tr. 115-116.

On January 10, 2013, upon reconsideration, state agency reviewing psychologist Bruce Goldsmith, Ph.D., reviewed the file and reached opinions similar to those found by Dr. Zwissler but added that, in addition to being limited to 1-2 step tasks in a routine environment, Trenka would be limited to simple tasks that are not fast paced or that did not have unusual production demands.  Tr. 127-128, 132-134.

### Drs. Torello and Pylaeva

On September 18, 2012, state agency reviewing physician Lynne Torello, M.D., reviewed the file and completed a Physical RFC Assessment.  Tr. 112-115.  Dr. Torello opined that Trenka had the ability to lift/carry 20 pounds occasionally and 10 pounds frequently; stand/walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday and push/pull unlimitedly, other than as specified for lift/carry.  Tr. 112-113.  Dr. Torello opined that, due to decreased range of motion and morbid obesity, Trenka had the following postural limitations: occasionally climb ramps/stairs, stoop, kneel, crouch, and crawl; frequently balance; and never climb ladders/ropes/scaffolds.  Tr. 113.   Dr. Torello noted no manipulative limitations but found visual limitations of limited near and far acuity in the right eye and limited depth perception in the right eye.  Tr. 113-114.  Dr. Torello also opined that Trenka should avoid unprotected heights, moving machinery, and commercial driving.  Tr. 114.

On January 9, 2013, upon reconsideration, state agency reviewing physician Olga V. Pylaeva, M.D., reached opinions similar to those found by Dr. Torello.  Tr. 130-132.

## C.     Hearing testimony

### 1.     Plaintiff's testimony

Trenka testified and was represented at the hearing.  Tr.  50, 51-78.   Trenka lived with his girlfriend.  Tr. 56.  He was not able to help around the house much because he his fatigued

and in pain all the time.  Tr. 56.  About once a week, he tries to make breakfast.  Tr. 56-57.  At home, Trenka indicated he is unable to complete tasks he starts and is constantly forgetting things.  Tr. 70.  Trenka uses a computer but only to check emails.  Tr. 71.

Since the aneurysm, his personality has changed.  Tr. 77-78.  He gets angry and says inappropriate things.  Tr. 71, 77-78.  He does not deal well with change.  Tr. 78.  Since his aneurysm, he has been physically aggressive.  Tr. 71-72.  He has broken things and punched a wall.  Tr. 72.  Trenka was seeing a psychologist and psychiatrist at Connections and they have been helping him work through his anger problems.  Tr. 72.

Up until his aneurysm in April 2012, Trenka drove.  Tr. 58.  Since his aneurysm, Trenka has not driven because he is legally blind in his right eye.  Tr. 57, 58, 64.  Trenka's girlfriend drives him where he needs to go.  Tr. 60.  If his girlfriend was not able to drive him places, Trenka is not sure whether he would be able to use public transportation because he is not sure he would be able to walk to where he would get picked up and/or he is not sure he would know how to get to where he needed to go.  Tr. 60.  Trenka can read for about 15 minutes at a time.  Tr. 60.  Trenka spends his days at home watching television, playing cards or board games with his girlfriend, playing with his dog, and eating meals.  Tr. 60.  Trenka usually does not go out to eat because he feels like he is being looked at and he does not like being around people.  Tr. 60-61.

When Trenka had his aneurysm, he was in the hospital for two weeks and then in a rehab center for two weeks.  Tr. 63.  Trenka recalls that the rehab was minimal.  Tr. 63-64.  Once a day, he would do the rowing machine and walk up and down steps.  Tr. 63-64.  Trenka discussed how his life changed since his stroke.  Tr. 61.  He has no energy.  Tr. 67.  He used to be able to find his way to wherever he needed to go; other people counted on him.  Tr. 61.  Now, he wakes

up and does not always know what day it is or what hour it is.  Tr. 61.  He has trouble falling

asleep.  Tr. 61.  He takes medication to help him fall asleep.  Tr. 61.  His girlfriend sets all of

Trenka's medications up for him.  Tr. 62.  Trenka only sleeps for 3-4 hours at one time.  Tr. 62,

76.  He does not feel refreshed after sleeping.  Tr. 62.  Trenka uses oxygen when he sleeps.  Tr.

76.  His pain causes him to wake up.  Tr. 62.  He has pain in his back, upper neck, shoulders, and

all the way into his lower back.  Tr. 62.  Trenka uses a TENS unit but it only provides temporary

relief.  Tr. 63.

       Since the aneurysm, Trenka has problems with his hands.  Tr. 73.  His hands go numb a

couple of times per week.  Tr. 73.  He has not been evaluated for carpal tunnel syndrome.  Tr.

73.  Following the aneurysm, Trenka can stand for about 15-20 minutes at a time.  Tr. 73.  After

that amount of time, his back starts to feel like it is going to break into two pieces at his lower

back.  Tr. 73.  He has to rest for about 30-45 minutes before getting back up again.  Tr. 73-74.

Trenka can only walk about a block.  Tr. 74.  He can sit for about 15-20 minutes and has to

adjust himself about every 10 minutes.  Tr. 74-75.  As far as his ability to lift things, he struggled

once while trying to lift and carry a bucket of water about 10 steps.  Tr. 74-75.

       With respect to the blindness in his right eye, his vision has continued to get worse.  Tr.

64.  Trenka indicated that his right eye vision has gone from 20/100 to 20/1000.  Tr. 64.  Since

his aneurysm, he has redness in both his right and left eye.  Tr. 65.  Also, he has pain in his right

eye a couple of times each week, which feels like stabbing needles.  Tr. 65.  Sunlight is very

bothersome to both eyes, with his right eye being bothered 100% and his left eye 20%.  Tr. 66.

       Trenka constantly has headaches.  Tr. 66.  The pain is dull and throbbing and travels

down his neck into his shoulder and into his lower back.  Tr. 67.  Also, he experiences sharp,

stabbing pain on the top of his head.  Tr. 67.  His doctors, including a pain management

specialist, have prescribed various medications for his headaches but nothing has really worked. Tr. 68.

Trenka does not feel he could perform his past masonry work because his fatigue and pain would prevent him performing the physical aspects of the job and he could not deal with being around people such as the crew or clients, if they were around.  Tr. 69-70.

### 2.    Tracie Clay's testimony[8]

Tracie Clay ("Tracie"), Trenka's long-time girlfriend, testified at the hearing.[9]  Tr. 79-90. She works from home and is able to keep an eye on Trenka.  Tr. 83.  Tracie explained that, before Trenka's aneurysm, he was more outgoing, he was very friendly with people, he did not really have fear of any situations, he was strong, he was kind, and was a good person.  Tr. 80-81.

Tracie was the one who found Trenka when he had his aneurysm.  Tr. 81.  Tracie found Trenka having a seizure and he was taken to Hillcrest Hospital.  Tr. 81.  He was in the hospital for two weeks and then he went to rehab.  Tr. 82.  Per Tracie, Trenka went to rehab because he was not remembering things, they wanted him to get more strength, and they wanted to watch his blood pressure to make sure he did not develop another bleed.  Tr. 82.

Since the aneurysm, Tracie explained that Trenka really does not have any ability to concentrate; he loses his focus really quickly; he is unable to stay on task and/or complete a project. Tr. 82.   Trenka gets tired and fatigued and is unable to do things that he used to be able to do such as housework and house repairs.  Tr. 83.

Tracie has observed a change in Trenka's personality since his aneurysm.  Tr. 83-84. There have been times when Trenka has become very agitated towards her.  Tr. 84.  She irritates

---

[8] During Tracie's testimony, at Trenka's counsel's request, Trenka left the room.  Tr. 78-79.

[9] Tracie also completed statements regarding her observations of Trenka.  Tr. 234-241, 294-295.  In addition to Tracie's third-party statements, other individuals completed statements regarding their personal observations of Trenka, including his cousin  (Tr. 285-286), his aunt  (Tr. 287), and two friends  (Tr. 296-297).

Trenka for no apparent reason and he is really mean towards her.  Tr. 84.  Trenka gets frustrated about once a week and throws things in the house.  Tr. 84-85.  Per Tracie, Trenka does not remember his outbursts.  Tr. 85.  Tracie knows that Trenka would never mean to hurt her but, since the aneurysm, she has been afraid that he might hurt her.  Tr. 85.  Also, he has become very irritated with people while they are out places.  Tr. 84.  Also, he makes inappropriate comments while out in public.  Tr. 84.  Trenka does not socialize a lot.  Tr. 85-86.  He has a few old friends still but most of his friends are unable to accept how Trenka acts now.  Tr. 85-86.  Trenka says things that could be offensive to others, which Tracie feels would impact his ability to work.  Tr. 86.  Trenka has occasional paranoia when he is around other people.  Tr. 88.  He believes that people are talking about him.  Tr. 88-89.  Per Tracie, before the aneurysm, Trenka was very self-confident.  Tr. 89.

When Trenka tries to use both his eyes, he gets eye pain and his eyes become very blood-shot.  Tr. 86.  Trenka has headaches every day.  Tr. 86.  Trenka has tried various medications for his headaches but they have had bad side effects.  Tr. 86.  Trenka was trying Oxycodine at the time of the hearing but Tracie said he was only taking it occasionally because he did not want to become addicted.  Tr. 87.  When Trenka has a really bad headache, he lies down for 4-5 hours.  Tr. 87.  Before the aneurysm, Tracie indicated Trenka had a little back pain and may have had occasional neck pain from straining himself at work but his pain was nothing compared to what he was experiencing post-aneurysm.  Tr. 87.

Tracie takes Trenka to all his doctor appointments.  Tr. 87-88.  Since his mental health treatment, Tracie has noticed that Trenka was talked more about how he feels but she did not notice any "direct improvement."  Tr. 88.

### 3.        Vocational expert's testimony

 Vocational Expert Stephen Davis ("VE") testified at the hearing.  Tr. 91-99.   The ALJ

asked the VE to describe Trenka's past work, including his masonry restoration work and work

at the cleaning company.  Tr. 92.  The VE described Trenka's past relevant work as: supervisor,

building manager, a skilled, SVP 6 position[10] that is classified in the DOT as and was performed

at the medium level; and supervisor, home restoration service, a skilled, SVP 6 position[11] that is

classified in the DOT at the medium level and was performed at the heavy level.  Tr. 92.

The ALJ then asked the VE to consider an individual that was Trenka's age with the

same education and past relevant work experience as Trenka who has the physical capacity for

light work, can climb ramps and stairs occasionally; can never climb ladders, ropes, or scaffolds;

can frequently balance, and occasionally stoop, kneel, crouch, and crawl; has to avoid all

exposure to hazards defined as industrial machinery, unprotected heights, etc; can perform

simple, repetitive tasks in an environment that is not fast-paced and does not have strict

production demands; has the capacity for superficial interaction with others; and has the capacity

to work in a static environment where changes in routine could be readily explained.  Tr. 92-93.

The VE indicated that the described individual would be unable to perform Trenka's past work.

Tr. 93.   However, the VE indicated that there would be other unskilled, light jobs that the

described individual could perform, including (1) table worker, with 229,000 jobs available

nationally and 33,000 in Ohio; (2) lamination inspector, with 97,000 jobs available nationally

---

[10] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation.
Social Security Ruling No. 00-4p, 2000 SSR LEXIS 8, *7-8 (Social Sec. Admin.  December 4, 2000).   Using the
skill level definitions  in 20 CFR § 404.1568, unskilled work corresponds to an SVP of 1-2; semi-skilled work
corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT.  *Id.*

[11] The VE indicated that the DOT classified the supervisor, home restoration service position at an SVP 7 but the VE
lowered it to a 6.  Tr. 92.

and 4,100 in Ohio; and (3) shipping and receiving weigher, with 187,000 jobs available nationally and 3,100 in Ohio.  Tr. 93-94.  With respect to the table worker job, the VE added that he would reduce the stated numbers by 25%   because some of the positions would have quotas.  Tr. 93.

Trenka's counsel asked the VE if the described individual could perform the listed jobs if the individual needed to take a 15 minute break every 30 minutes.  Tr. 94-95.  The VE indicated that breaks of that nature would result in one-half an hour being lost from every hour at work, which would be too much time off-task, and therefore the individual would not be able to perform any of the listed jobs.  Tr. 95.   Trenka's counsel asked whether an additional limitation of only occasional bending and balancing would impact the individual's ability to perform the listed jobs.  Tr. 95.  The VE responded that such a limitation would not cause the three listed jobs to be unavailable.  Tr. 95.  Trenka's counsel asked the VE various questions about being off-task or unable to complete or perform the jobs for a certain percentage of time.  Tr. 95-96, 98-99.  The VE indicated that the limit for being off-task in an unskilled job is 15%.  Tr. 95-96, 98-99.  With respect to tolerance for absenteeism, the VE indicated that, in unskilled work, one day per month was the limit.  Tr. 99.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable

to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.   If the claimant is doing substantial gainful activity, he is not disabled.

2.   If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.   If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.   If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.   If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

# IV. The ALJ's Decision

In her June 13, 2014, decision, the ALJ made the following findings:[12]

1.  Trenka met the insured status requirements through December 31, 2016. Tr. 28.

2.  Trenka had not engaged in substantial gainful activity since April 26, 2012, the alleged onset date.  Tr. 28.

3.  Trenka had the following severe impairments: status post brain aneurysm; Terson's syndrome; left shoulder pain; affective disorder; and obesity.  Tr. 28-29.  The ALJ found that hypertension was not a severe impairment.  Tr. 28-29.

4.  Trenka did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. Tr. 29-31.

5.  Trenka had the RFC to perform light work; occasionally climb ramps and/or stairs; never climb ladders, ropes or scaffolds; frequently balance; occasionally stoop, kneel, crouch, and crawl; must avoid all exposure to workplace hazards, such as industrial machinery, unprotected heights, and commercial driving; perform simple, repetitive tasks in an environment that is not fast paced, and does not have strict production demands; has the capacity for superficial interaction with others; able to work in a static work environment, where changes in routines are readily explained.  Tr. 31-39.

6.  Trenka was unable to perform any past relevant work.  Tr. 39-40.

7.  Trenka was born in 1973 and was 38 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 40.

8.  Trenka had at least a high school education and was able to communicate in English.  Tr. 40.

9.  Transferability of job skills was not material to the determination of disability.  Tr. 40.

10. Considering Trenka's age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that Trenka could perform, including table worker, lamination inspector, and shipping and receiving weigher.  Tr. 40-41.

---

[12] The ALJ's findings are summarized.

Based on the foregoing, the ALJ determined that Trenka had not been under a disability from April 26, 2012, through the date of the decision.  Tr. 41.

## V. Parties' Arguments

First, Trenka contends that the ALJ failed to adhere to the treating physician rule when weighing the opinions of his treating physicians, Dr. Augis and Dr. Campbell.  Doc. 12, pp. 13-18; Doc. 15, pp. 2-8.   Second, Trenka contends that the RFC is not supported by substantial evidence because the ALJ did not properly consider evidence regarding his visual impairment and the impact of his fatigue, depression and headaches on his ability to sustain activities or complete them in a timely manner.  Doc. 12, pp. 18-21; Doc. 15, pp. 8-11.

In response, the Commissioner argues that the ALJ considered the medical opinions in accordance with the regulations and assigned proper weight to Trenka's treating physicians, Dr. Augis and Dr. Campbell.  Doc. 14, pp. 17-22.   The Commissioner also argues that the ALJ's determination that Trenka had the RFC to perform a restricted range of light work is supported by substantial evidence. Doc. 14, pp. 13-17.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).  The Commissioner's findings "as to any fact if supported by substantial

evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

## A.    The ALJ properly considered the opinions of Dr. Augis and Dr. Campbell

Trenka argues that the ALJ violated the treating physician rule with respect to the opinions of her treating mental health providers, Dr. Augis and Dr. Campbell.  Doc. 12, pp. 13-18; Doc. 15, pp. 2-8.

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'"  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c )(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that

weight.  *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544; *Cole v. Comm'r of Soc. Sec.*, 661

F.3d 931, 937 (6th Cir. 2011).  In deciding the weight to be given, the ALJ must consider factors

such as (1) the length of the treatment relationship and the frequency of the examination, (2) the

nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the

consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6)

any other factors that tend to support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*,

478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c).

An ALJ is not obliged to provide "an exhaustive factor-by-factor analysis" of the factors

considered when weighing medical opinions.  *See Francis v. Comm'r of Soc. Sec.*, 414 Fed.

Appx. 802, 804 (6th Cir. 2011).   Nevertheless, the "good reasons must be supported by the

evidence in the case record, and must be sufficiently specific to make clear to any subsequent

reviewers the weight the adjudicator gave to the treating source's medical opinion and the

reasons for that weight."  *Cole*, 661 F.3d at 937 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR

LEXIS 9, at *12 (Soc. Sec. Admin. July 2, 1996)) (internal quotations omitted).

Although the ALJ did not provide controlling weight to either Dr. Augis's or Dr.

Campbell's opinions, the ALJ reviewed in detail Trenka's mental health treatment notes and

explained the weight assigned to those opinions, stating:

> The undersigned observes that these notes do not portray a picture of disabling
> mental illness.  They appear to reflect a process of coming to terms with a
> difficult childhood, adjusting to adult life and managing difficult changes.  These
> appear to be social issues rather than psychiatric matters.  These notes do not
> support the degree of limitation in Dr. Augis' assessment discussed below.
>
> ***
>
> Dr. Augis opined, "based on my 47 individual counseling sessions with (claimant)
> I conclude, that aneurysm that happened in April 2012 significantly impaired
> adaptation; increased his anger and inappropriate outbursts, self-destructive
> thoughts and suicidal ideation, confusion, social isolation and decreased his

frustration tolerance." (Exhibits 11F and 12F).  Only some weight is accorded to this assessment as the claimant's treatment notes do not support this degree of limitations. (Exhibit 11F).

\*\*\*

Limited weight is accorded to this [Dr. Campbell's] assessment.  As noted above, although a treating physician is to be given controlling weight, this is only if the statement is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence (20 CFR § 404.1527(d) and § 416.927(d)).  Treatment notes from Dr. Campbell and Dr. Augis do not support this degree of limitation.  (Exhibits 10F and 11F).  In addition, objective testing in the form of the WAIS-IV indicated that the claimant had sufficient comprehension to score an average range of intelligence, which supports the ability to perform at least simple tasks.  (Exhibit 6F).  The residual functional capacity assessment sufficiently addresses the claimant's mental health limitations.

Tr. 36-37.

Trenka claims that the ALJ failed to consider consistency of the opinions with the record as a whole.  However, the opinion makes clear that the ALJ considered objective WAIS-IV testing results and considered at length Trenka's treatment records.  Tr. 36-37.  In discussing the treatment notes, the ALJ described treatment notes reflective of both improvement and struggles.  Tr. 36-37.  The ALJ considered and weighed this evidence and found it to be inconsistent with the extreme limitations contained in the opinions of Dr. Augis and Dr. Campbell.  Tr. 36-37.  Trenka has not shown that this determination is not supported by substantial evidence.  For example, as reflected in the record and as found by the ALJ, Trenka was maintaining social relationships and engaging in hobbies and activities, evidence that supports the ALJ"s conclusion that the treatment notes were not consistent and/or did not support the degree of limitation contained in the opinions of Dr. Augis and Dr. Campbell.  Tr. 36-37; *see also e.g.,* Tr. 721, 727, 729.

Upon consideration of the foregoing, Trenka has not demonstrated that the ALJ impermissibly played doctor by weighing and considering the record evidence. *See e.g., Gibbens v. Comm'r of Soc. Sec.*, 2016 U.S. App. LEXIS 15198, *19-20 (6th Cir. Aug. 16, 2016) (rejecting a claimant's argument that the ALJ played doctor where records supported the ALJ's conclusion). Furthermore, it is not for this Court to reweigh the evidence. Thus, even if Trenka could demonstrate that his treatment records provide support for his claim that greater weight should have been provided to his treating source opinions, since there is substantial evidence to support the ALJ's decision, the Court may not overturn the Commissioner's decision. *Jones*, 336 F.3d at 477.

Additionally, even if Trenka was engaging in certain activities on only a limited rather than regular basis, Trenka has failed to show it was error for the ALJ to consider that evidence when weighing the medical opinions. Also, the ALJ did not completely dismiss Dr. Augis's and Dr. Campbell's opinions nor did she completely dismiss Trenka's subjective complaints. Tr. 36-37, 39. The ALJ included restrictions in the RFC to account for mental impairment limitations the ALJ found credible. More particularly, the RFC included the following mental limitations:

> Able to perform simple, repetitive tasks in an environment that is not fast paced, and does not have strict production demands. Has the capacity for superficial interaction with others. Able to work in a static work environment, where changes in routine are readily explained.

Tr. 31. The ALJ further explained,

> Pace limitations, as well as social interactions at only a superficial level account for the claimant's mental health symptoms of depression and a tendency towards social isolation and angry outbursts.

Tr. 39.

Based on the foregoing, the undersigned finds that the ALJ's analysis and weighing of the opinions of Dr. Augis and Dr. Campbell is sufficiently clear to allow the undersigned the

ability to conduct a meaningful review and finds that the ALJ's consideration of those medical opinions is supported by substantial evidence.[13]  Thus, the undersigned recommends that the Court find no error with respect to the ALJ's weighing of Drs. Augis's and Campbell's opinions.

**B.**  **Reversal and remand is required for further explanation of the RFC determination**

Trenka argues the ALJ erred in assessing her RFC because the ALJ misstated evidence regarding the severity of Trenka's vision problems and did not properly address or explain how Trenka's symptoms of fatigue, depression and headaches were accounted for in the RFC.  Doc. 12, pp. 18-22; Doc. 15, pp. 8-11.

Trenka argues that the ALJ misstated the evidence regarding the severity of his vision impairment, when the ALJ concluded that Trenka's best corrected vision was 20/100 in his right eye when in fact his vision worsened and, as of 2013, his best corrected vision in his right eye was 20/1000.  Doc. 12, p. 19; Doc. 15, p. 10 (citing Tr. 773, 778, 783).   Trenka is correct, the ALJ appears to have either misinterpreted or overlooked the evidence showing that, in August 2013, according to Dr. Singh, Trenka's best corrected vision in his right eye was 20/1000.  Tr. 783-784 (August 12, 2013, ophthalmology exam); Tr. 789 (Dr. Singh's report indicating that best-correct visual acuity in right eye as of August 12, 2013, was 20/1000).  At one point in her brief, the Commissioner acknowledges Dr. Singh's 2014 functional capacity assessment confirmed that the best corrected vision in Trenka's right eye was 20/1000.  Doc. 14, p. 10. Nonetheless, in arguing that the RFC is supported by substantial evidence, the Commissioner states that, in assessing functional limitations caused by Trenka's vision problems, "the ALJ

---

[13] Trenka also argues that the ALJ's reliance on the state agency reviewing psychologists' opinions does not constitute substantial evidence because the opinions were rendered before most evidence was in the record.  Doc. 15, p. 8. However, the ALJ's reliance on those opinions was not error since the ALJ considered the entirety of the record, including records that post-date the opinions of the state agency reviewing physicians.  *See McGrew v. Comm'r of Soc. Sec.*, 343 Fed. Appx. 26, 32 (6th Cir. Aug. 19, 2009); *see also Helm v. Comm'r of Soc. Sec.*, 405 Fed. Appx. 997, 1002 (6th Cir. 2011) ("There is no categorical requirement that the non-treating source's opinion be based on a 'complete' or 'more detailed and comprehensive' case record. The opinions need only be 'supported by evidence in the case record.'") (discussing SSR 96-6p, 1996 WL 374180, at *2 (1996)).

relied heavily on Dr. Singh's clinical findings that Plaintiff's best corrected visual acuity in his right eye was 20/100 (R. 35)."  Doc. 14, p. 14.

The Regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant evidence" of record. 20 C.F.R. § 404.1545(a); 20 C.F.R. § 404.1546(c).  Further, "an ALJ is not required to discuss every piece of medical opinion evidence." *Karger v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 739, 753 (6th Cir. 2011).  However, "[a]n ALJ is bound to adhere to certain governing standards when assessing the medical evidence in support of a disability claim." *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 723 (6th Cir. 2014) (citing *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 545 (6th Cir.2004)). "Chief among these is the rule that the ALJ must consider all evidence in the record when making a determination, including all objective medical evidence, medical signs, and laboratory findings."  *Id.* (citing 20 C.F.R. § 404.1520(a)(3); 20 C.F.R. § 404.1512(b); 20 C.F.R. § 404.1513).

Here, the undersigned is unable to conclude that the ALJ properly considered all relevant evidence since the evidence regarding Trenka's visual acuity testing suggests a worsening of Trenka's vision impairment and shows that, as of August 2013, Trenka's best corrected vision in his right eye was 20/1000 (Tr. 783-784, 789), not 20/100 as found by the ALJ (Tr. 29 ("[T]he claimant's best corrected visual acuity, measured in August 2013, was 20/20 in the left eye, and 20/100 in the right eye. (Exhibit 14F)[;]" Tr. 35 ("The claimant's best corrected visual acuity in the left eye was 20/20, and 20/100 in the right eye.").  As a result of this error in interpreting the evidence, the undersigned is unable to assess whether the RFC is supported by substantial evidence.  Furthermore, the Commissioner does not argue or explain how this error is harmless and/or why it does not require further explanation from the ALJ.  Accordingly, the undersigned

recommends that the Court reverse and remand the case for further evaluation of the medical evidence regarding Trenka's vision impairments and further explanation as to how the functional limitations included in the RFC adequately account for Trenka's vision impairments.  In light of the foregoing recommendation, it is further recommended that on remand the ALJ be required to more fully explain how the RFC limitations adequately account for Trenka's fatigue, depression and headaches.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **REVERSE and REMAND** the Commissioner's decision for further proceedings consistent with this recommendation.


December 8, 2016

Kathleen B. Burke
United States Magistrate Judge


## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).